UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
YEXY GAME,

                Plaintiff,

        -against-                          **ORDER**
                                           23 CV 7833 (CLP)

LAFAYETTE GLASS COMPANY, INC. and
HILLARY HULTEEN,

                Defendants.
----------------------------------------------------------X
**POLLAK**, United States Magistrate Judge:

On October 20, 2023, plaintiff Yexy Game commenced this action against defendants Lafayette Glass Company, Inc. and Hillary Hulteen, alleging claims of retaliation and interference in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*, discrimination claims under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL"), and retaliation under the New York Labor Law ("NYLL"). (Compl.[1] ¶ 4). On October 8, 2024, the parties consented to the jurisdiction of the undersigned Magistrate Judge (ECF No. 17), and on November 6, 2024, plaintiff filed a motion for partial summary judgment as to liability on plaintiff's FMLA interference claim. (ECF Nos. 18, 19, 20, 21). Thereafter, on December 27, 2024, defendants filed a cross-motion for summary judgment, seeking judgment in their favor on the plaintiff's FMLA interference claim and seeking to dismiss plaintiff's retaliation claims. (ECF Nos. 25, 26, 27).

For the reasons set forth below, the Court DENIES plaintiff's motion for partial summary judgment and DENIES defendants' cross-motion for summary judgment.

---

[1] Citations to "Compl." refer to plaintiff's Complaint, filed October 20, 2023. (ECF No. 1).

FACTUAL BACKGROUND

It is undisputed that defendant Lafayette Glass Company Inc. ("Lafayette" or the "Company") is an architectural metal and glass company, that offers installations of custom metal and glass for multimillion-dollar projects. (Pl.'s 56.1 Stmt[2] ¶ 2; Defs.' CntrStmt[3] ¶ 2; Defs.' 56.1 Stmt ¶¶ 1, 2). A New York corporation, headquartered in Hauppauge, N.Y., with an office in Manhattan, Lafayette employs more than 50 employees and is owned by defendant Hulteen, who is the Chief Executive Officer of the Company. (Pl.'s 56.1 Stmt ¶¶ 1, 3, 4; Defs.' CntrStmt ¶¶ 1, 3, 4; Defs.' 56.1 Stmt ¶¶ 1, 2, 3). Jack Walsh is the President of Lafayette and Melissa DiDiego is the Human Resources Manager. (Defs.' 56.1 Stmt ¶¶ 4, 5).

According to defendants, the Company is organized into different departments, with the Field Operations department overseeing onsite operations for glass and metal installations. (Id. ¶ 6). Between 2019 and 2024, the Company employed one to four Field Supervisors, depending on the number and size of Company projects, with Daniel Cordero serving as the Director of Field Operations. (Id. ¶¶ 7-10). According to defendants, in 2022, the Company employed 68-87 field employees, who are the skilled laborers who perform the installations at the Company's projects. (Id. ¶¶ 11, 12). However, in the second quarter of 2023 through 2024, the Company employed 30 or fewer field employees. (Id. ¶¶ 14, 19).

In 2014, plaintiff began working at the Company, initially as an Administrative Assistant, advancing over the next nine years to various positions. (Pl.'s 56.1 Stmt ¶¶ 5-7; Defs.' CntrStmt

---

[2] Citations to "Pl.'s 56.1 Stmt" refer to Plaintiff's Statement of Material Facts Pursuant to Local Rule 56.1, filed November 6, 2024. (ECF No. 20).

[3] Citations to "Defs.' CntrStmt" refer to Defendants Lafayette Glass Company, Inc. and Hillary Hulteen Counterstatements to Plaintiff's Rule 56.1 Statements, filed December 27, 2024. (ECF No. 27-2). In addition to responding to plaintiff's 56.1 Statement of Material Facts not in dispute, defendants filed a separate Statement of Material Facts Pursuant to Local Civil Rule 56.1. (ECF No. 27-1 ("Defs.' 56.1 Stmt")). Where relevant the Court has included citations to Defendants' 56.1 Statement and incorporated defendants' assertions and plaintiff's responses thereto in the general discussion of the facts.

¶¶ 5-7; Defs.' 56.1 Stmt ¶¶ 39-41).  In May 2019, plaintiff was promoted to Scheduling Manager within the Field Operations Department.  (Pl.'s 56.1 Stmt ¶¶ 9, 10; Defs.' CntrStmt ¶¶ 9, 10; Defs.' 56.1 Stmt ¶ 42).  According to defendants, between 2019 and 2023, Lafayette employed only one Scheduling Manager – plaintiff – a role that defendants claim was created for plaintiff. (Defs.' 56.1 Stmt ¶¶ 13, 44).  Before plaintiff assumed that role, the Field Operations team had only one department head and one field supervisor; it did not have a separate employee to do scheduling.  (Id. ¶¶ 15, 43).

In the position of Scheduling Manager, plaintiff's job responsibilities included working with the Company's project managers to determine personnel needs and then assigning and scheduling employees to the projects, along with maintaining the schedule and payroll for field workers.  (Pl.'s 56.1 Stmt ¶ 14; Defs.' 56.1 Stmt ¶¶ 48, 51, 52; but see Defs.' CntrStmt ¶ 14 (agreeing in part but stating that "[m]ost of Plaintiff's time was spent performing data entry (60%)")).  Defendants contend that "data entry consumed a large part of her time."  (Defs.' 56.1 Stmt ¶ 49).  In her position as Scheduling Manager, plaintiff worked Monday through Friday, 7:00 a.m. to 4:00 p.m., reporting directly to Director of Operations Daniel Cordero.  (Pl.'s 56.1 Stmt ¶¶ 11, 12; see Defs.' CntrStmt ¶¶ 11 (agreeing that plaintiff reported directly to Cordero but noting that his correct title was Director of Field Operations), 12; Defs.' 56.1 Stmt ¶ 47). According to defendants, plaintiff's workload typically involved data entry for 60-80 employees. (Defs.' 56.1 Stmt ¶ 53).

On October 10, 2022, plaintiff informed the Human Resources Department ("HR") that she was pregnant and would need to take maternity leave in the Spring of 2023.  (Pl.'s 56.1 Stmt ¶ 15; but see Defs.' CntrStmt ¶ 15 (indicating that while they do not dispute that she notified the Company in "the Fall of 2022," the transcripts do not reflect a specific date).  According to

Cordero, plaintiff told him in September 2022 that she was two months pregnant.  (Defs.' 56.1 Stmt ¶ 54).  Defendants contend that at the time they first learned of her pregnancy, the Company "had already decided that her job would likely need to be terminated due to a foreseeable shortage of work," with the plan being to terminate plaintiff unless the work picked up.  (Id. ¶ 56).  Defendants note that another employee took maternity leave at around the same time as plaintiff, and she returned to work and was not terminated.  (Id. ¶¶ 57, 63).  Indeed, defendants claim that because they valued plaintiff, they tried to keep her on for as long as they could, even though they knew inevitably she would have to be terminated.  (Id. ¶ 58).

In January 2023, plaintiff spoke with Cordero and with Melissa DiDiego, the Company's HR Manager, about her maternity leave and return to work afterwards.  (Pl.'s 56.1 Stmt ¶¶ 16, 18; Defs.' 56.1 Stmt ¶ 59; but see Defs.' CntrStmt ¶¶ 16, 18 (agreeing that the Company engaged in "numerous" meetings prior to plaintiff's leave).  Ms. DiDiego sent plaintiff the required paperwork, which plaintiff submitted on or about March 15, 2023, requesting twelve weeks of continuous leave from May 18, 2023 until August 10, 2023, pursuant to New York's Paid Family Leave Act ("NYPFL").  (Pl.'s 56.1 Stmt ¶¶ 17, 19, 20; Defs.' CntrStmt ¶¶ 17, 19, 20 (noting that plaintiff's leave began six weeks earlier than estimated)).  Plaintiff took FMLA leave concurrently with her NYPFL leave.  (Pl.'s 56.1 Stmt ¶ 21; Defs.' CntrStmt ¶ 21; Defs.' 56.1 Stmt ¶ 62).  The Company approved her leave request.  (Pl.'s 56.1 Stmt ¶ 22; Defs.' CntrStmt ¶ 22).

Plaintiff contends that before taking leave on April 5, 2023, her tasks were divided among at least three other Lafayette employees, with Cordero taking on the bulk of her scheduling responsibilities and role interacting with the project managers.  (Pl.'s 56.1 Stmt ¶¶ 23-25; see Defs.' CntrStmt ¶¶ 24, 25, 30 (agreeing that plaintiff's leave began on April 5, 2023, but

disagreeing with respect to the division of plaintiff's tasks)).  According to plaintiff, the Payroll Administrator took on plaintiff's payroll responsibilities with respect to the field employees, and several other employees assumed responsibility for plaintiff's duties, coordinating manpower for the service business line and project management needs.  (Pl.'s 56.1 Stmt ¶¶ 26, 27).  When plaintiff initially went out on leave on April 5, 2023, the Company hired a temporary employee who assisted Cordero for approximately two months.  (Pl.'s 56.1 Stmt ¶¶ 28-30).

Defendants disagree with many of these assertions, contending that plaintiff's job duties were "substantially reduced because of companywide downsizing."  (Defs.' CntrStmt ¶ 24; see Defs.' 56.1 Stmt ¶ 67 (stating that the "majority" of plaintiff's responsibilities were "eliminated")).  According to defendants, as early as late 2021, the Company realized they needed to downsize because of the overall reduction in the workload.  (Defs.' 56.1 Stmt ¶ 16).  According to defendant Hulteen's testimony, the Company was "not dealing with as many people, as many projects.  We were significantly downsized."  (Defs.' CntrStmt ¶ 24 (citing Hulteen Dep.[4] at 30–35)).  Defendants contend that as a result of the "downsizing and process improvement initiative," "'every role [and] every person'" was reviewed.  (Defs.' 56.1 Stmt ¶ 17 (quoting Hulteen Dep. at 37)).  According to defendants, discussions concerning eliminating the Scheduling Manager role began in 2022 – even before plaintiff announced her pregnancy – when Cordero, Hulteen, DiDiego, and Walsh met monthly to discuss workload and project status.  (Defs.' 56.1 Stmt ¶ 23).  Defendants' charts demonstrate that between January 24, 2020 and February 1, 2024, the total number of employees was reduced from 114 to 49.  (Defs.' 56.1 Stmt ¶¶ 18, 20).  Three of the four Field Supervisor positions were eliminated due to a reduction in work, and plaintiff's other job duties were reduced or eliminated to conform with the Acumatica

---

[4] Citations to "Hulteen Dep." refer to the transcript of the deposition of Hillary Hulteen, taken on August 13, 2024.  (Buzzard Decl., Ex. 3).

platform.[5]  (Defs.' 56.1 Stmt ¶¶ 21, 32, 35, 37 (describing other changes in process)).

Defendants assert that these changes to make the Company compatible with Acumatica "were

being implemented prior to Plaintiff's leave," and resulted in a reduction and elimination of a lot

of data entry.  (Defs.' CntrStmt ¶ 24).  Defendants disagree that Cordero took on the bulk of

plaintiff's responsibilities, explaining instead that they had been eliminated by "independent

internal processes improvements or done in preparation for Acumatica."  (Id. ¶ 25).  They also

disagree that the Payroll Administrator took on plaintiff's responsibilities with respect to field

employees, again noting that the employee headcount was significantly reduced, and much of the

data entry for payroll was eliminated.  (Id. ¶ 26).  As for the claim that the Company hired a

temporary employee to assist Cordero, defendants contend that Cordero asked Kyle Walsh, the

son of Hulteen, and the President of the Company, Jack Walsh, if he wanted to "'come' in to

'keep him busy.'"  (Id. ¶ 28).  Defendants also dispute that he worked for two months, instead

claiming that he only worked for two weeks.  (Id. ¶ 29).

For the first part of her leave, plaintiff used her vacation and sick leave, and then short-

term disability before starting her concurrent NYPFL/FMLA leave on approximately May 18,

2024.  (Pl.'s 56.1 Stmt ¶ 32; Defs.' CntrStmt ¶ 32).  Plaintiff contends that no decision had been

made to terminate her employment prior to beginning maternity leave.  (Pl.'s 56.1 Stmt ¶ 34).

Defendants, however, assert that the termination decision was reached prior to learning of

plaintiff's pregnancy.  (Defs.' CntrStmt ¶ 34).  Defendants contend that the decision was made as

a result of feedback that Cordero received from peers at competing entities, indicating that the

competition did not employ a scheduling manager and used "[a] data entry heavy process" to

schedule field employees.  (Id.)  Defendants claim that once they learned of plaintiff's

_____

[5] See discussion infra at 8–10.

6

pregnancy, they delayed the termination as long as possible, hoping that the work would return to levels that would justify plaintiff's employment.  (Id.)

According to plaintiff, her concurrent NYPFL/FMLA leave was scheduled to end on approximately August 10, 2023.  (Pl.'s 56.1 Stmt ¶ 33; but see Defs.' CntrStmt ¶ 33 (disagreeing and noting that the FMLA paperwork includes estimated dates and is therefore inaccurate "when used in this context")).  On or about July 31, 2023, plaintiff reached out to Ms. DiDiego to discuss her return to work.  (Pl.'s 56.1 Stmt ¶ 35; Defs.' CntrStmt ¶ 35).  Plaintiff contends that around the same time, Cordero met with defendant Hulteen to discuss any accommodations that would be made when plaintiff returned or whether her employment would be terminated.  (Pl's 56.1 Stmt ¶ 36).  Defendants disagree with this assertion, citing the July 31, 2023 email that describes the meeting as one to "'discuss severance and her role with Danny.'"  (Defs.' CntrStmt ¶ 36).

While plaintiff was still on leave, in July or August 2023, a decision was made to terminate plaintiff.  (Pl.'s 56.1 Stmt ¶ 42).  According to the August 9, 2023 Termination Letter ("Termination Letter") she received, while plaintiff was on maternity leave, her supervisors, including defendant Hulteen and Ms. DiDiego, reviewed plaintiff's role and overall workload, determining that the Company's "current staff members" were able to coordinate plaintiff's work into their own duties and therefore plaintiff's role was dissolved.  (Pl.'s 56.1 Stmt ¶¶ 37-40).  Defendants agree that the quoted passage from the Termination Letter stating that her role and workload were reviewed was accurate, but explain that the review occurred "concurrent" with the process improvements in the company.  (Defs.' CntrStmt ¶ 37).

Plaintiff cites Cordero's testimony that he made the termination decision, after consulting with Hulteen and Jack Walsh, President of Lafayette.  (Pl.'s 56.1 Stmt ¶¶ 43-46).  According to

Cordero, Hulteen was involved in and approved of the termination decision. (Pl.'s 56.1 Stmt ¶ 47). Cordero believed that there was no need for plaintiff's position because the arrangements to cover her duties were "working out," and defendant Hulteen indicated she was not concerned about who would perform plaintiff's duties. (Pl.'s 56.1 Stmt ¶¶ 50, 51). Defendants maintain that Ms. Hulteen was part of the overall review process and company-wide downsizing initiative, but that the ultimate decision to eliminate the role of Scheduling Manager and terminate plaintiff was Cordero's. (Id. ¶¶ 38, 46). Similarly, to the extent plaintiff alleges that Ms. DiDiego was involved in the review and downsizing, defendants agree but note that she was brought in after the decision to fire plaintiff had been made by Cordero. (Id. ¶ 39).

The Termination Letter sent to plaintiff stated:

> During your maternity leave, we have reviewed your role and workload. Following significant process improvements, we have determined that current staff members are able to coordinate your work into their regular duties, and your role has been dissolved. At this time we do not have any positions available that fit your background and experience.

(Pl.'s 56.1 Stmt ¶ 53 (citing Buzzard Decl.,[6] Ex. 16); Defs.' CntrStmt ¶ 53).

Plaintiff alleges that all of her responsibilities are currently being performed by other Lafayette employees and that from 2020 through 2023, there was no "planned layoff" at Lafayette. (Pl.'s 56.1 Stmt ¶¶ 54-57). In March 2024, Lafayette began using Acumatica, an enterprise solutions software for accounting and project management. (Pl.'s 56.1 Stmt ¶¶ 58, 59). Plaintiff asserts that Acumatica is not a scheduling tool and did not take over any of plaintiff's tasks. (Pl.'s 56.1 Stmt ¶¶ 60, 61). Moreover, whatever assistance was provided by Acumatica was not provided until the system was fully rolled out in 2024. (Pl.'s 56.1 Stmt ¶ 62).

---

[6] Citations to "Buzzard Decl." refer to the Declaration of Lucas C. Buzzard, dated November 6, 2024. (ECF No. 21).

Defendants largely disagree. They assert that plaintiff's tasks relating to Scheduling Manager were either eliminated or significantly reduced as a result of the downsizing and reduction in data entry. (Defs.' CntrStmt ¶¶ 54, 55, 56). Defendants dispute plaintiff's assertion that there was no "planned layoff," citing Ms. Hulteen's testimony that "the company was in the middle of a strategic downsizing as a result of a change in market demand as early as 2021," and the company's headcount reports an elimination of "more than sixty percent of its roles." (Id. ¶ 57). Specifically, defendants cite the reduction of the office/marketing staff from seven roles to one, the project management positions from 15 to four, and the purchasing department from five to one, all during the period from January 24, 2020 and February 1, 2024. (Defs.' 56.1 Stmt ¶ 27). Defendants assert that plaintiff served as a "'middle person'" between the project managers and other departments. (Id. ¶ 37). By eliminating this middle layer, project managers could communicate directly with the shop rather than having to go through plaintiff. (Id.)

Defendants also contend that during this time period, it was determined that the operational processes needed to be streamlined to eliminate process redundancies, especially in the area of data entry. (Id. ¶ 30). The Company decided to adopt Acumatica, an enterprise solutions software for accounting and project management, with the primary benefit of eliminating or reducing redundancies in data entry. (Id. ¶¶ 31, 32). Although defendants agree that the original launch date for the Acumatica software was March 6, 2023, they assert that prior to the actual launch in March 2024, the Company underwent operations and process changes in order to be compatible with the new system. (Defs.' CntrStmt ¶ 59; Defs.' 56.1 Stmt ¶¶ 33, 34). Defendants also dispute plaintiff's claim that Acumatica is not a scheduling tool and did not assume any of plaintiff's functions, asserting that it does "timekeeping" as one of its functions, and greatly reduced the need for data entry. (Defs.' CntrStmt ¶¶ 60, 61). Among other things,

9

defendants "streamline[d] the scheduling process," by combining client work order and job load tickets, eliminating the Field Work order and AM/PM Job load tickets template.  (Defs.' 56.1 Stmt ¶ 35).  The Company also eliminated certain information previously recorded on field employee timesheets, which resulted in the reduction of payroll entry data.  (Id. ¶ 36). Defendants also dispute that the assistance provided by Acumatica was not in place until the system was fully rolled out, noting that it required a massive overhaul of the Company's processes before it was rolled out completely.  (Defs.' CntrStmt ¶ 62).

Plaintiff moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking summary judgment on her claim that defendants directly interfered with her right to be reinstated following her protected leave.  (ECF No. 19).  Plaintiff contends that there are no issues of material fact in dispute and that the evidence demonstrates that after nine years of employment with defendants, she was terminated because she sought to take leave under the FMLA in order to care for her newborn child.  (Id. at 1).  She contends that although she was eligible to take leave and gave proper notice, defendants determined that plaintiff's duties could be covered by other employees and thus they "callously terminated her employment" the day before she was set to return to work.  (Id.)

Defendants cross-move for summary judgment, also contending that there are no material issues of fact in dispute, but asserting that the termination decision was made prior to defendants learning about plaintiff's pregnancy, and was based upon a bona fide plan to implement process improvements and to downsize the workforce in response to a decline in work.  (ECF No. 27 at 6).

<u>DISCUSSION</u>

10

I.     Summary Judgment Standards

It is well-settled that a party moving for summary judgment has the burden of

establishing that no genuine issue of material fact is in dispute and that the moving party is

therefore entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a); Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); New York Marine & Gen. Ins. Co. v. Lafarge N. Am.,

Inc., 599 F.3d 102, 114 (2d Cir. 2010).  Since summary judgment is an extreme remedy, cutting

off the rights of the non-moving party to present their case to the jury, see Buck v. Cleary, 345 F.

App'x 660, 662 (2d Cir. 2009); Egelston v. State Univ. Coll. at Geneseo, 535 F.2d 752, 754 (2d

Cir. 1976); Gibralter v. City of New York, 612 F. Supp. 125, 133–34 (E.D.N.Y. 1985), the Court

should not grant summary judgment unless "it is quite clear what the truth is" and "there can be

but one reasonable conclusion as to the verdict."  Rogoz v. City of Hartford, 796 F.3d 236, 246

(2d Cir. 2015) (quoting Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 467 (1962);

Anderson v. Liberty Lobby, Inc., 477 U.S. at 250).  However, "the mere existence of *some*

alleged factual dispute between the parties alone will not defeat an otherwise properly supported

motion for summary judgment."  Garden City Apartments, LLC v. Xcel Plumbing of N.Y., Inc.,

233 F. Supp. 3d 346, 350 (E.D.N.Y. 2017) (emphasis in original) (quoting Anderson v. Liberty

Lobby, Inc., 477 U.S. at 247–48).

Once the moving party discharges its burden of proof, the party opposing summary

judgment has the burden of setting forth "'specific facts showing that there is a genuine issue for

trial,' wherein 'a reasonable jury could return a verdict for the non-moving party.'"  International

Bus. Machs. Corp. v. BGC Partners, Inc., No. 10 CV 128, 2013 WL 1775367, at *4 (S.D.N.Y.

Apr. 25, 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  A party opposing a

properly supported motion for summary judgment "may not rest upon the mere allegations or

denials of his pleadings." Mitsubishi Motor Credit of Am., Inc. v. Country Motors LLC, No. 07 CV 3528, 2008 WL 3200248, at *2 (E.D.N.Y. Aug. 5, 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Although "[a]ll ambiguities must be resolved, and all inferences drawn, in favor of the non-moving party[,] . . . '[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" Adler v. Kent Vill. Housing Co., 123 F. Supp. 2d 91, 97 (E.D.N.Y. 2000) (quoting D'Amico v. City of New York, 132 F.3d 145, 159 (2d Cir. 1998), cert. denied, 524 U.S. 911 (1998); Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)); see also Mhany Mgmt., Inc. v. County of Nassau, 819 F.3d 581, 621 (2d Cir. 2016).

Federal Rule of Civil Procedure 56 provides that, in moving for summary judgment or responding to such a motion, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Rule 56's "requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'" Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004) (citing Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir. 1988)). If assertions in an affidavit "are not based upon the affiant's personal knowledge, contain inadmissible hearsay, or make generalized and conclusory statements," a court may strike those portions of the filing, or decline to consider those portions

12

that are not based on personal knowledge or are otherwise inadmissible.  Serrano v. Cablevision

Sys. Corp., 863 F. Supp. 2d 157, 163 (E.D.N.Y. 2012) (citations omitted).  While the Court need

consider only the materials cited by the parties, it may consider any other materials in the record

in deciding a motion for summary judgment.  Fed. R. Civ. P. 56(c)(3).

    II.     Plaintiff's FMLA Interference/Retaliation Claim

        A.   FMLA Standards

The FMLA was enacted to provide job security for employees who need to "take

reasonable leave for medical reasons . . . and for the care of a child, spouse, or parent who has a

serious health condition."  29 U.S.C. § 2601(a)(4), (b)(2).  Under the FMLA, an eligible

employee is entitled to twelve workweeks per year of unpaid leave to care for a newborn.  29

U.S.C. § 2612(a)(1)(A).  Upon returning from such leave, the employee is entitled to be restored

to his or her position or an equivalent position.  29 U.S.C. § 2614(a)(1).  The FMLA prohibits an

employer from interfering with an employee's exercise of his rights under the Act, 29 U.S.C.

§ 2615(a)(1), and from discharging or in any other manner discriminating against an individual

for opposing any practice made unlawful by this subchapter.  29 U.S.C. § 2615(a)(2).  Any

eligible employee who was wrongfully denied benefits under the Act or who faced retaliation

because of the exercise of their rights under the Act is authorized to bring a private action against

the employer under the FMLA.  See 29 U.S.C. §§ 2611, 2615, 2617; 29 C.F.R. § 825.220 (stating

that "employers cannot use the taking of FMLA leave as a negative factor in employment

actions, such as hiring, promotions or disciplinary actions").

Under the Act, employees who take FMLA leave are also entitled to be restored to their

position or an equivalent position "on return from such leave."  29 U.S.C. § 2614(a)(1)(A)-(B).

The statute further provides that an employer may not "interfere with, restrain, or deny the

exercise of or the attempt to exercise" any right provided for by the FMLA.  29 U.S.C.

§ 2615(a)(1).  Interference claims are appropriate when "the employer in some manner impeded

the employee's exercise of his or her right[s]" afforded substantive protection under the

FMLA.  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 176 (2d Cir. 2006) (quoting Potenza v.

City of New York, 365 F.3d 165, 168 (2d Cir. 2004)).  A plaintiff bears the burden of establishing

only a prima facie case for interference claims, and the court need not consider the issue of the

employer's intent.  Id.; see Brown v. Pension Bds., 488 F. Supp. 2d 395, 408 (S.D.N.Y. 2007).

The Second Circuit has identified five factors that a plaintiff must show to establish a

claim of interference under the FMLA:  "1) that she is an eligible employee under the FMLA; 2)

that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave

under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5)

that she was denied benefits to which she was entitled under the FMLA."  Graziadio v. Culinary

Inst. of Am., 817 F.3d 415, 424 (2d Cir. 2016); see Brown v. Pension Bds., 488 F. Supp. 2d at

408.

    B.  Plaintiff's Prima Facie Case

Plaintiff contends that under the undisputed facts, she meets her burden of establishing

the five elements of the Graziadio test.  (ECF No. 19 at 7).  First, plaintiff had been employed

full time for defendants since 2014, working at least 40 hours per week, for an annual total of

2,080 hours.  (Id. at 8).  An employee is eligible for FMLA coverage if they were employed for

at least 12 months and worked at least 1,250 hours for the employer during the 12 months prior

to beginning FMLA leave.  29 U.S.C. § 2611(2)(A); see Arroyo-Horne v. City of New York, 831

F. App'x 536, 539 (2d Cir. 2020).  Thus, plaintiff satisfies the first requirement of the eligibility

test.

To establish the second element, plaintiff must show that defendants are a covered employer under the Act. An FMLA-covered employer is defined as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4)(A)(i); see Coutard v. Municipal Credit Union, 848 F.3d 102, 108 (2d Cir. 2017). In their Answer, defendants admit that Lafayette Glass is a covered employer under the FMLA. (See Buzzard Decl., Ex. 2 ¶ 7).

As for the third and fourth elements, plaintiff asserts that she was clearly entitled to take off twelve workweeks of FMLA leave to give birth and care for her newborn child. (ECF No. 19 at 8). Further, she gave Lafayette Glass proper notice of an intention to take leave by submitting her NYPFL leave request in mid-March 2023, and the leave was approved on April 12, 2023. (Id. at 8–9). This was in compliance with the FMLA regulations. See 29 C.F.R. § 825.302(a) (requiring at least 30 days advance notice if the need for leave is foreseeable).

Plaintiff further contends that by denying her reinstatement to her position upon return from her leave, "she was denied benefits to which she was entitled under the FMLA." Graziadio v. Culinary Inst. of Am., 817 F.3d at 424. The FMLA provides that any eligible employee who takes FMLA leave is entitled to be restored to either the position of employment held when leave commenced or an equivalent position. 29 U.S.C. § 2614(a)(1)(A)-(B); see Woods v. START Treatment & Recovery Ctrs., Inc., 864 F.3d 158, 166 (2d Cir. 2017). The court in Fernandez v. Windmill Distrib. Co. noted that the right to be reinstated is "a benefit at the crux of the FMLA's provisions." 159 F. Supp. 3d 351, 363 (S.D.N.Y. 2016); see also Sanders v. City of Newport, 657 F.3d 772, 778 (9th Cir. 2011) (describing the right to reinstatement as the "linchpin" of the FMLA's "entitlement theory because 'the FMLA does not provide leave for leave's sake, but

15

instead provides leave with an expectation that an employee will return to work after the leave ends'" (quoting <u>Throneberry v. McGehee Desha Cnty Hosp.</u>, 403 F.3d 972, 978 (8th Cir. 2005))).

Courts have held that evidence that the employer failed to reinstate an employee out on FMLA leave either to her original position or an equivalent position constitutes a prima facie showing of an interference claim under the FMLA.  <u>See, e.g.</u>, <u>Gauthier v. Yardney Tech. Prods., Inc.</u>, No. 05 CV 1362, 2007 WL 2688854, at *4–5 (D. Conn. Sept. 13, 2007); <u>see also</u> <u>Sanders v. City of Newport</u>, 657 F.3d at 778 (collecting cases from various circuits).

Plaintiff cites the Termination Letter that explicitly states that plaintiff's role and workload were reviewed during her maternity leave and that it was determined that "current staff members are able to coordinate [plaintiff's] work into their own regular duties" in support of her argument that the accommodations made to redistribute plaintiff's responsibilities while she was on maternity leave resulted in the elimination of her position.  (ECF No. 19 at 10 (citing Pl.'s 56.1 Stmt ¶¶ 37, 40, 53, and quoting Buzzard Decl., Ex. 16)).  Plaintiff quotes 29 C.F.R. § 825.214, which contemplates this situation and provides:

> On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment.  An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence.

(ECF No. 19 at 11 (emphasis omitted) (quoting 29 C.F.R. § 825.214)).  Plaintiff cites cases in which the employer made the decision to lay off the plaintiff after leave had commenced, <u>see, e.g.</u>, <u>Elias v. Community Res. For Independence, Inc.</u>, No. 12-14, 2014 U.S. Dist. LEXIS 42245 at *11–12 (W.D. Pa. Feb. 12, 2014), <u>report and recommendation adopted by</u>, 2014 WL 1316071 (W.D. Pa. Mar. 28, 2014), or where the employer decided not to reinstate based on the

distribution of the employee's duties to others, <u>see, e.g.</u>, <u>Breneisen v. Motorola, Inc.</u>, 512 F.3d 972, 976–78 (7th Cir. 2008).

### C.   Defendants' Affirmative Defense

In response, defendants argue that an employee's right to reinstatement is not absolute and that she has "no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." (ECF No. 27 at 11 (quoting 29 C.F.R. § 825.216)).  Citing <u>Passante v. Cambium Learning Group</u>, defendants argue that plaintiff's role as Scheduling Manager was "dissolved strictly for business needs and to eliminate redundancies" (ECF No. 27 at 19), thus satisfying their burden to show that they had a "'lawful reason, <i>i.e.</i>, a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position.'" (<u>Id.</u> at 11 (quoting <u>Passante v. Cambium Learning Grp.</u>, No. 23 CV 4060, 2024 WL 4171026, at *14 (E.D.N.Y. Sept. 12, 2024) (internal citations omitted))).

Defendants contend that the company's downsizing "was dramatic and directly correlated to Plaintiff's duties," plus the "ongoing process initiatives directly affected the volume of data entry and administrative support that formed the core of Plaintiff's role." (ECF No. 27 at 11). Defendants further note that it is "unfortunate[]" that plaintiff became pregnant in the middle of the downsizing and process improvement initiatives and these combined "irrefutably rendered Plaintiff's role redundant and necessary for elimination." (<u>Id.</u>)  Defendants contend that they eliminated her role as Scheduling Manager purely because of "business needs," explaining that they had no control over the downturn in work. (<u>Id.</u> at 11–12)  In support of their argument, defendants cite the statistics showing that from January 2022 through April 2023, the company reduced the number of field employees by 60% and eliminated three out of four Field Supervisor

roles, as well as the only site supervisor.  (Id. at 12).  Defendants claim that the last Field

Operations role to be eliminated was Scheduling Manager position, and they assert that because

plaintiff's duties correlated directly to the company's headcount, so that rather than having to

schedule 87 field tradesman – the number peaked in the fourth quarter of 2022 – by the time

plaintiff returned from, there were only 29 field tradesmen.  (Id.)  According to defendants, the

Scheduling Manager role was only created to manage growth, and when that reversed course at

around the time plaintiff went on leave, the elimination of her role was inevitable.  (Id. at 14).

Defendants also contend that before plaintiff became pregnant, Cordero spoke with a peer

for insight into how to manage scheduling and learned that the competitor did not use a

scheduling manager but instead had a simpler process that Cordero decided to adopt, which did

not require plaintiff's position.  (Id.)  In addition, defendants prepared to launch Acumatica and

related process changes to eliminate an excessive amount of data entry.  (Id. at 15).  Defendants

note that plaintiff has admitted that this process began before she left on leave and was intended

to streamline her tasks.  (Id.)  To the extent that plaintiff's role prior to taking leave included

acting as a "middleman" between project management and other departments, the process was

modified to eliminate the middleman and have project managers communicate directly with

other departments.  (Id. at 15–16).  Defendants contend that all of these changes occurred

because of the downturn in work and the elimination in redundancies.  (Id.)

Defendants argue that plaintiff cannot demonstrate that her job would have existed and

that she fails to provide any admissible evidence to show that the changes that occurred during

her leave were due to her leave and not because of the downsizing and process improvements.

(Id. at 16–17).  Citing Daniel Cordero's testimony, defendants assert that the evidence shows that

even before taking leave, he contemplated terminating plaintiff's role but determined to delay

notifying her in the hope that the company would rebound during her leave. (Id. at 18). Thus, defendants assert that plaintiff's FMLA interference claims fail and summary judgment should enter in favor of defendants.

### D. Plaintiff's Response to Defendants' Justification Argument

In responding to defendants' arguments, plaintiff notes that when an employer seeks to establish that it has a legitimate reason to deny an employee reinstatement after leave, the Second Circuit has concluded that this is an affirmative defense and that the burden shifts to the employer to prove by a preponderance of the evidence that an employee laid off during FMLA leave would have been dismissed regardless of the employee's request for leave. (ECF No. 19 at 13–14 (citing Barger v. First Data Corp., 851 F. App'x 278, 280 (2d Cir. 2021))). Having established her prima facie case, plaintiff contends that defendants have the burden to prove their defense. (Id.)

Plaintiff argues that contrary to defendants' claims, the defendants have admitted that the review of plaintiff's role that resulted in her termination "took place while she was on leave," when defendants concluded that other employees could do plaintiff's work. (ECF No. 19 at 14 (emphasis omitted)). She cites Cordero's testimony that during a conversation with Hulteen and Walsh that occurred while plaintiff was already on leave, Cordero told them: "[b]ased on the way things are and the way things look like they are going to be in the next few months, I don't think that we can bring [plaintiff] back. . . . [S]ince it's working out, it's been well, I don't think there is a need for that position." (Id. (emphasis omitted)). He further testified that before that conversation, the elimination of plaintiff's position was "just a possibility." (Id. at 15). Plaintiff argues that it was her very absence from work while on leave that led defendants to believe they

19

could eliminate her role and that other arrangements could be successfully made to cover her duties.  (Id.)

Plaintiff contends that her case is similar to Jett v. AGL Res., Inc., where the defendant determined that the plaintiff's position could be eliminated because other employees absorbed plaintiff's duties and responsibilities while she was on leave.  No. 03 CV 2953, 2006 WL 8431289, at *4 (N.D. Ga. Mar. 29, 2006).  In Jett, the Court denied defendants' motion for summary judgment on the interference claim because the employer's own arguments "suggest that [the employee's] FMLA leave at least contributed or played some role in [the] decision to eliminate [her] position."  Id. at *19.

Plaintiff argues that not only was her leave linked to the defendants' decision to eliminate her position, but defendants cannot show that she would have been terminated in August 2023 had she not been out on leave.  (ECF No. 29 at 16).  She contends that had she not been out on leave, defendants would not have determined that other employees were able to handle her responsibilities.  (Id.)  Moreover, although defendants characterize plaintiff's termination as a layoff, they have not provided any evidence to show that there was a "planned layoff" in 2023, nor that there was a "set number" of employees to be laid off.  (Id. at 17).  By contrast, Cordero testified that it was only a "possibility" that plaintiff's position would be eliminated and not decided until he spoke with Hulteen and Walsh while plaintiff was on leave.  (Id.)

Moreover, to the extent that defendants argue that plaintiff has failed to demonstrate that her position would have survived the downsizing, plaintiff asserts that this is "a bald attempt to flip" the defendants' burden of proof to plaintiff, rather than defendants "prov[ing] by the preponderance of the evidence that [she] would have been terminated even if [she] had not been on leave."  (ECF No. 29 at 11 (quoting Barger v. First Data Corp., 851 F. App'x at 281 (holding

that in the absence of such evidence, the "termination of [Plaintiff's] position before [s]he exhausted h[er] 12-week [FMLA] leave was unlawful"))).  Plaintiff also notes that defendants must demonstrate that she "'would not otherwise be employed at the time reinstatement is requested.'"  (Id. at 12 (emphasis omitted) (quoting Bernard v. Bishop Noland Episcopal Day Sch., 630 F. App'x 239, 242 (5th Cir.))).  Plaintiff argues that a reasonable juror could consider the timing of the final decision to eliminate plaintiff's position – only days before her imminent return from leave – and the stated rationale for the termination – namely, that other employees who had been doing her work could continue permanently – and determine that her leave status was certainly a factor inextricably linked to the termination decision.  (Id.)  Plaintiff reached out to Ms. DiDiego on July 31, 2023 to discuss returning to work, and DiDiego sent her question on to Hulteen, knowing that she was going to speak to Cordero about plaintiff's role.  (Id. at 13).  DiDiego made it clear that it was at this meeting when the final decision was made to eliminate plaintiff's role.  (Id.)  Plaintiff argues that if defendants had a reason unrelated to plaintiff's leave, the absence of any such rationale in the Termination Letter and their stated determination that "current staff members [we]re able to coordinate [plaintiff's] work into their regular duties," belie any such alternative rationale.  (Id. (quoting Buzzard Decl., Ex. 16)).  Three of defendants' own witnesses explained that the termination decision was made while she was on leave and was because the "company was functioning ok without her" and other employees had successfully absorbed her job responsibilities.  (See Cordero Dep.[7] at 68–69; DiDiego Dep.[8] at 25; Hulteen Dep. at 95–96).

---

[7] Citations to "Cordero Dep." refer to the transcript of the deposition of Daniel Cordero, taken on August 12, 2024.  (Buzzard Decl., Ex. 4).
[8] Citations to "DiDiego Dep." refer to the transcript of the deposition of Melissa DiDiego, taken on August 15, 2024.  (Buzzard Decl., Ex. 5).

Even if an employee has been replaced or his position been restructured to accommodate the employee's absence, the employee is still entitled to reinstatement.  See 29 C.F.R. § 825.214; Breneisen v. Motorola, Inc., 512 F.3d at 976, 978; Jett v. AGL Res. Inc., 2006 WL 8431289, at *4.

Plaintiff challenges defendants' reliance on the headcount chart showing the number of employees in each department as of the first payroll of each quarter, noting that at the beginning of the second quarter of 2023 – April 1, 2023 – there were 29 employees in the company's field operations team.  (ECF No. 29 at 16 (citing DiDiego Decl.,[9] Ex. A)).  Plaintiff began her leave on April 5, 2023, at which time, Ms. DiDiego testified that Kyle Walsh was hired as a temporary employee "'to support Danny [Cordero] in [plaintiff's] absence.'"  (Id. (quoting Buzzard Decl., Ex. 5 at 16–17)).  In addition, DiDiego testified that in April 2023, at the same time plaintiff went out on leave, the company had significant projects and was hiring and promoting new employees to fill open positions.  (Id. at 17).  DiDiego also testified that at this same time, the company was still planning to have plaintiff return to work in August 2023.  (Id.)  At the time plaintiff was scheduled to return from leave, there were 30 field operations employees – one more than when plaintiff began her leave.  (See DiDiego Decl., Ex. A).  Plaintiff argues that no reasonable juror could conclude that defendants suddenly felt the need to eliminate plaintiff's position based on the headcount in August.  (ECF No. 29 at 17).  Even more salient is the fact that in 2020, during COVID, when there were approximately the same number of field workers, plaintiff was not laid off.  (Id.)

Although defendants argue that the Termination Letter referenced the various process improvements that were allegedly made and which eliminated plaintiff's role, they have not

_____

[9] Citations to "DiDiego Decl." refer to the Declaration of Melissa DiDiego, filed by defendants on December 27, 2024.  (ECF No. 26).

22

specified when those changes were actually made or even that they were made prior to the decision to terminate plaintiff's employment. (Id. at 18). These include: 1) the scheduling process changes under which Cordero simply texted employees regarding their schedules; 2) the adoption and implementation of Acumatica; 3) the simplification of payroll data entry; and 4) the elimination of plaintiff's role as go-between for project management and other departments. (Id.) With respect to the change in scheduling process, Cordero testified that he discussed the issue with a counterpart at a competitor and then decided he would adopt the simplified contact process, but no date has been provided as to when this conversation occurred or when the subsequent decision was made. (Id. at 19 (citing Defs.' 56.1 Stmt ¶¶ 24, 25, 27, 37; Cordero Dep. at 25, 29–30); see also Hulteen Dep. at 52, 53–54, 55, 56, 58–59 (indicating an ability to testify when the process improvement change was actually implemented)).

As for the implementation of Acumatica, defendants concede that it was fully rolled out and went into effect March 2024, seven months after plaintiff's termination. (Id. at 20). Plaintiff also cites the testimony of Cordero denying that the Acumatica software took over plaintiff's tasks: "'Q: So that tool [Acumatica] did not take over [plaintiff's] tasks in any way? A: Not that I'm aware, no.'" (Id. (quoting Cordero Dep. at 66)). Plaintiff, on the other hand, testified that she never used Acumatica before going out on leave, and that she had heard about plans to start the program but was told it was going to make her job more efficient. (Id. at 20–21).

Hulteen testified that the simplification of payroll data was another process that justified plaintiff's termination, but she could not recall if it was implemented before or after plaintiff's termination. (Id. at 21 (citing Defs.' 56.1 Stmt ¶ 36; Hulteen Dep. at 49–50)). Finally, with respect to eliminating plaintiff's role as middle person, defendants do not provide a date by which this change was implemented, and, indeed, plaintiff questions if in fact it ever was or if

23

Cordero simply took over the role while plaintiff was on leave. (Id. at 21–22). Although defendants argue that the Termination Letter referenced these process improvements, no evidence has been provided to show that these changes were made prior to the decision to terminate plaintiff's employment. (Id. at 22). Given the absence of evidence demonstrating when these improvements occurred, plaintiff argues that defendants have failed to carry their burden of demonstrating that their decision to terminate her rather than reinstating her after her FMLA leave was wholly "'unrelated to [her] exercise of her FMLA rights.'" (Id. at 23 (quoting ECF No. 27 at 11)).

 E. <u>Analysis</u>

 Having carefully considered the parties' respective positions, the Court finds that there are a number of material issues of fact in dispute that prevent summary judgment for either party.

 There is no question that plaintiff has satisfied her prima facie burden of showing that she was entitled to take FMLA leave to care for her newborn child and entitled to reinstatement at the completion of her leave time. There is also no question that only days before she was scheduled to return to work, defendants made the decision to terminate her position and communicated that decision to her through a Termination Letter. The language of the Termination Letter is not in dispute; the letter stated:

> During your maternity leave, we have reviewed your role and overall workload. Following significant process improvements, we have determined that current staff members are able to coordinate your work into their regular duties, and your role has been dissolved. At this time, we do not have any positions available that fit your background and experience.

(Buzzard Decl., Ex. 16).

 Under the FMLA, it is clear that plaintiff was entitled to be restored to either the position of employment she held when her leave commenced or an equivalent position, 29 U.S.C.

§ 2614(a)(1)(A)-(B), and that by denying her reinstatement to her position upon return from her leave, "she was denied benefits to which she was entitled under the FMLA." See Graziadio v. Culinary Inst. of America, 817 F.3d at 424. If the evidence provided by plaintiff, demonstrating that the employer failed to reinstate her and instead terminated her position while she was on the verge of returning from leave and for the reasons stated in the Termination Letter, were the only evidence in the case, plaintiff might very well have been entitled to summary judgment on her claim of FMLA interference.

However, in this case, defendants have raised the affirmative defense that they had a "lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position." Passante v. Cambium Learning Grp., 2024 WL 4171026, at *14 (citation omitted). They contend that plaintiff's role as Scheduling Manager was "dissolved strictly for business needs and to eliminate redundancies," and plaintiff's pregnancy was "unfortunate" in that it happened in the middle of this process. (ECF No. 27 at 19). In support, defendants rely on the statistics that demonstrate a downturn in the volume of jobs the company was receiving and the correlation between plaintiff's duties and the downsizing and process initiatives. (Id. at 11).

While evidence of a downturn in the business and a scheduled layoff of workers can provide a lawful reason unrelated to the employee's FMLA rights, plaintiff has raised a number of factual issues from which a jury could conclude that plaintiff's being out on leave was a factor in this case that contributed to the decision not to reinstate her. First, the defendants are vague in their description of the timing of certain events, such as Cordero's decision to streamline the scheduling process. Although he testified to discussing the position of Scheduling Manager with a competitor, he does not state whether this occurred prior to plaintiff taking leave or after.

Indeed, in the absence of further evidence as to the timing of this conversation, an inference could be drawn that he had this conversation after plaintiff went out on leave for the very reason that he was then responsible for handling this role and needed a way to deal with the added responsibility. Similarly, with respect to the adoption of the Acumatica systems, the evidence seems clear that the discussions regarding adopting the system and the initial steps in implementing the system were undertaken prior to plaintiff's leave, but she testified that she had been told that the system was going to streamline her work, not that it would replace her altogether; moreover, Cordero, in his testimony, conceded that it was not intended to replace plaintiff's role. Given that the system did not actually go online until March 2024, seven months after her termination, a jury could consider the defendants' reliance on this system as a post hoc justification for not reinstating plaintiff because the company realized her position could be adequately covered by others. Again, with the simplification of payroll data and the elimination of plaintiff's role as a middle person, Hulteen could not recall when these process changes were implemented – whether before or after plaintiff's termination – and plaintiff has suggested that at least with respect to the latter, it is unclear if it was implemented at all or just taken over by Cordero. While a jury could credit the defendants' evidence that all of these process changes were implemented due to a reduction in force and that plaintiff's leave was irrelevant, a jury could also find that the defendants' reliance on these changes was merely pretextual and designed to obscure the fact that plaintiff's leave at least in part was a factor in not reinstating her. As this Court noted in Philippe v. Santander Bank, N.A., the "Second Circuit has warned that, if the moving party's case depends upon the credibility of witnesses, the motion should be denied." No. 15 CV 2918, 2018 WL 2078235, at *18 (E.D.N.Y. Feb. 28, 2018) (citing Heyman v. Queens Vill. Comm. for Mental Health, 198 F.3d 68, 72 (2d Cir. 1999)).

Here, the credibility of defendants' witnesses is a critical factor in determining the validity of their explanation of the decision not to reinstate plaintiff. For example, defendants rely on the testimony of plaintiff's supervisor that even before she went on leave, he contemplated terminating plaintiff's role. However, his own testimony as well as that of other witnesses confirms that the decision to terminate plaintiff did not occur until after she had gone on leave; indeed, the decision appears to have been made, according to the testimony of Ms. DiDiego, on July 31, 2023, after plaintiff had reached out to discuss returning to work and only days before her contemplated return. Cordero made it clear that it was at this meeting when the final decision was made to eliminate plaintiff's role. (ECF No. 29 at 14). As plaintiff notes, however, Cordero's credibility is suspect because at the time of her termination, he sent a text message in which he stated that he was not aware of the decision to terminate her, only later to testify that he was "lying" in the text message. (Seliger Decl.,[10] Ex. 10; Cordero Dep. at 47, 48, 54–55).

More importantly, the stated rationale for her termination as set forth in the Termination Letter provides a basis from which it could be inferred that because her tasks had been successfully redistributed while she was on leave, the company had, as a consequence, reconsidered the continued need for her role, and decided not to reinstate her. Even if the jury credited that the company was facing a downturn in work and felt the need to lay off employees, the jury could also consider the statements in the Termination Letter, along with the timing of the termination decision just days before plaintiff's return, and the testimony that her job was being successfully handled by other people, as evidence that her FMLA leave status was certainly a factor inextricably linked to the failure to reinstate her and in the termination decision.

---

[10] Citations to "Seliger Decl." refer to the Declaration of Leah Seliger, filed by plaintiff on February 14, 2025. (ECF No. 31).

Accordingly, because the Court finds that there are material issues of fact in dispute, including credibility determinations to be made by a jury, the Court denies the cross-motions for summary judgment on plaintiff's FMLA interference claim.

III.    Defendants' Motion to Dismiss the FMLA Retaliation Claim

Separately, defendants have cross-moved to dismiss plaintiff's FMLA retaliation claim. (ECF No. 27 at 19–22).

A.    Standards for Retaliation Claims Under the FMLA

The parties agree that claims for retaliation under the FMLA are analyzed under the McDonnell Douglas burden shifting framework.  (See ECF No. 27 at 19; ECF No. 29 at 23); see also Potenza v. City of New York, 365 F.3d at 168 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  Under McDonnell Douglas, the plaintiff must first demonstrate a prima facie case of retaliation.  To establish a prima facie case of FMLA retaliation, plaintiff must show (1) "he exercised rights protected under the FMLA," (2) "he was qualified for his position," (3) "he suffered an adverse employment action," and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  (ECF No. 27 at 19–20 (citing Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 147 (2d Cir. 2012))); see also Thomsen v. Stantec, Inc., 483 F. App'x 620, 623 (2d Cir. 2012) (quoting Potenza v. City of New York, 365 F.3d at 168).  Once the plaintiff demonstrates the elements necessary to make out a prima facie case, then the defendant has the burden of showing a legitimate, non-discriminatory reason for its conduct.  Graziadio v. Culinary Inst. of Am., 817 F.3d at 429.  If the defendant successfully presents evidence of a non-discriminatory reason, then the burden shifts back to plaintiff to show that the explanation is "pretextual."  Id.

Plaintiff correctly notes that defendants have not argued that plaintiff cannot establish a prima facie case for her retaliation claim. (ECF No. 29 at 23). They do not dispute that plaintiff engaged in protected activity when she went out on FMLA leave. (See ECF No. 27 at 20). Nor do defendants claim that the company was not aware of plaintiff's leave or that there is any question that her termination constitutes an "adverse employment action." (Id.) Nor have defendants argued that plaintiff was not qualified for her position or that she lacked the competence and skills necessary to perform the job. See Ruiz v. County of Rockland, 609 F.3d 486, 492 (2d Cir. 2010); Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 30 (2d Cir. 1997)). Defendants' argument rests on their claim that the company was forced to make reductions in its workforce due to a downturn in projects and that these bona fide layoffs, which included plaintiff, demonstrate a legitimate reason for her termination.

Defendants argue that in order to demonstrate pretext, plaintiff must proffer evidence that demonstrates that the company's downsizing and process improvements were false. (ECF No. 27 at 20 (citing Thomsen v. Stantec, Inc., 483 F. App'x at 623; and Gioia v. Force Media LLC, 501 F. App'x 52, 56 (2d Cir. 2012))). Defendants contend that they launched a downsizing initiative "well before Plaintiff's pregnancy." (Id. at 21). They contend that the Court should grant summary judgment "because Plaintiff's leave did not a [sic] play a factor in Defendant's downsizing and process improvement initiatives that led to the elimination of the Scheduling Manager role." (Id. at 22).

Plaintiff notes that not only are there inconsistencies in defendants' arguments that her termination was solely due to downsizing, but there are credibility issues as to who was responsible for the ultimate determination to terminate plaintiff's employment. (ECF No. 29 at 24). Citing as an example the text message Cordero sent to plaintiff saying that he was not aware

of the decision to terminate her and that "HH made this call" (id. (quoting Seliger Decl., Ex. 10)), plaintiff notes that at his deposition, Cordero testified that he was "lying" to plaintiff in the text message and that it had been his decision all along (id. (citing Cordero Dep. at 48, 54)).

      B.  <u>Analysis</u>

As set forth *supra*, the Court has already found that there are material issues of fact in dispute that preclude granting summary judgment in favor of either party on plaintiff's FMLA interference claim. For the same reasons, the Court finds that a jury could credit the testimony of defendants' witnesses that the downsizing was the only factor leading to plaintiff's termination or they could conclude that because plaintiff was on leave, and her tasks had been successfully managed by others in her absence, her taking leave was a factor in the decision to not reinstate her and to terminate her instead in retaliation for her taking leave.

Accordingly, the Court denies defendants' motion for summary judgment on plaintiff's retaliation claim.

IV.   <u>Defendants' Motion to Dismiss the Remaining Claims</u>

Finally, defendants ask the court to decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims in the event that the federal claims are dismissed. Given that the Court has determined that material issues of fact remain in dispute on the plaintiff's federal claims, the Court finds no reason to dismiss the remaining state law claims and will try them together with the FMLA interference and retaliation claims.

<u>CONCLUSION</u>

As set forth above, the Court DENIES plaintiff's motion for partial summary judgment and DENIES defendants' cross-motion for summary judgment. By **<u>October 20, 2025</u>**, the

parties are directed to file either a Joint Proposed Pretrial Order or a joint status report advising the Court whether they seek a settlement conference or a referral to mediation.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated:  Brooklyn, New York
        September 30, 2025

                                        /s/ Cheryl L. Pollak
                                        Cheryl L. Pollak
                                        United States Magistrate Judge
                                        Eastern District of New York